RAYMOND F. MAHER, Administrator of the Estate of Wilbur Arthur Maher, Deceased,

*Plaintiff and Appellant,*

vs.

THE CITY OF CASPER, a municipal corporation of Wyoming,

*Defendant and Respondent.*

RICHARD E. GRIFFIN, Administrator of the Estate of Roger Earl Griffin, Deceased,

*Plaintiff and Appellant,*

vs.

THE CITY OF CASPER, a municipal corporation of Wyoming,

*Defendant and Respondent.*

(Nos. 2457, 2458; June 6th, 1950, 219 Pac. (2d) 125)

For the appellant each cause was submitted upon the brief of John J. McIntyre of Casper, Wyoming.

For the respondent each cause was submitted upon the brief of William H. Brown, Jr., of Casper, Wyoming.

272

OPINION

BLUME, Justice.

The two cases herein, which have been consolidated for hearing, involve the drowning of two boys on the premises hereinafter mentioned on July 3, 1947. The court sustained a demurrer to the second amended petitions herein, and plaintiffs electing to stand upon the pleadings, judgments were entered in favor of the defendant. From these judgments the respective plaintiffs have appealed.

The facts in the two cases herein are identical, inasmuch as the boys were drowned at the same time and in the same place, and were companions. The second amended petitions allege the appointment of the respective plaintiffs as administrators of the deceased boys, and that the defendant is a city of the first class. Further allegations are as follows:

"3. On or about the 10th day of August, 1931, the defendant became the owner in fee simple of the real estate described as Lot 1 and Lot 2 (less a 5.69 acre tract in the northwest corner of said lot), in Section 3, Township 33 North, Range 79 West; also the S½-SW¼SE¼ of Section 34, Township 34 North, Range 79 West, 6th P. M., by purchase and under a warranty deed from the Wyoming National Bank of Casper,

Trustee. Ever since that time it has owned and does now own such real estate.

"4. Said real estate is adjacent to but outside the corporate limits of the City of Casper, and during all the time that it has been owned by said city it has been open to the Casper public and used for various purposes by citizens and residents of Casper. Its use during that time has been principally as a playground for children and as a recreation ground for adults. It has also been used, during that time, as a pasture for livestock by private individuals, under a lease or leases from the City of Casper, and the city has derived gain and profit from such leases. In connection with this use, a riding academy was maintained and operated on said land for several years. Residents and citizens of Casper have also, during that time, been permitted to haul from said real estate gravel and building materials for private building and construction purposes. In some cases charges were made by the city for such materials and in some cases no charges were made.

"5. On and about July 3, 1947, said real estate was being used only for a public playground and recreation ground and for the operation of said riding academy. Such uses were constant and continual and with the full knowledge and acquiescence of the City.

"6. During the time said City owned said real estate it has purposely and intentionally devoted it to the uses herein described. At no time has it ever excluded or attempted to exclude children or the public from said property, but instead it has kept and maintained the property as a playground and recreation ground, inviting and permitting its use as such during all the time it has been publicly owned.

"7. Prior to August 10, 1931, private individuals removed gravel from the property herein described, caus-

ing and leaving a large excavation or gravel pit thereon. Inside this gravel pit, these individuals did additional digging for gravel from a deeper vein, using a drag line for such deep operations. In so doing they created and caused a steep, perpendicular and very irregular bluff within the pit. Beyond this bluff, they piled a large quantity of discarded and unusuable earth. At present the top of this pile of earth is approximately on a level with the top of said bluff and about fifteen or twenty feet away from it. In between is a deep valley or channel the bottom of which is fifteen feet beneath the top of said bluff.

"8. Since these operations, water has filled the bottom of the gravel pit, concealing and hiding said bluff and the valley beneath it. This water also conceals and hides the pile of earth, except for a dead tree stump which extends above the surface of the water. Said water is not clear, and there is no visibility beneath its surface. The portion of the pit above the bluff forms a sandy ledge or shelf, which is now partially covered with water in such a manner as to make a sandy beach. The beach has a water front of about 300 feet, and the water on it is very shallow. The shallowness extends out to said bluff, which is ten to twenty feet from the water's edge. There is then a sudden drop-off at this point from the sandy beach, the water being about two feet deep at the edge of the bluff and about fifteen feet deep at the bottom. The tree stump on the top of the pile of earth and extending out of the water, however, causes a false appearance of shallowness out to it.

"9. Since August 10, 1931, children of Casper and many adults also have habitually and continually used said pit for wading and swimming in the s ummer months and for skating in the winter months. The defendant has, during all that time, had full knowledge of the fact that said pit was being so used, and it has

continually acquiesced in such use." It was further alleged that the boys about ten years of age were playmates and neither of them could swim and neither of them knew of the existence of the hazard above mentioned; that they both removed their shoes and stockings and waded and played in the shallow water along said beach and being unaware of the drop in the water, they fell down and were drowned; that other children, as well as adults, were drowned previously in the same place and citizens of Casper had complained to the defendant about the dangerous condition of the pit and requested that it be filled in sufficiently to eliminate dangerous drop-offs; that the cost of filling in the pit would not exceed $75.00, and to fence the pit would not cost to exceed $250.00; that defendant negligently failed to take steps to guard the pit and make it safe from dangers; that the negligence of the defendant was the sole cause of the death of the boys. Damages in each case were asked in the sum of $25,000.

In the original petitions and in the first amended petitions plaintiffs relied upon the doctrine of attractive nuisance, under which, when applicable, children, though trespassers, enjoy the status and protection of invitees. 38 Am. Juris. 806. After issues had been joined the cases came on for trial. The defendant objected to the introduction of any evidence on the ground that the petitions failed to state a cause of action. The court sustained the objection, evidently upon the ground that the attractive nuisance doctrine did not apply to the water hazard herein, thus adopting the prevailing rule stated in 56 Am. Juris. 850, as follows: "The weight of authority is to the effect that ponds, pools, lakes, streams, reservoirs, and other waters do not constitute attractive nuisances, at least in the absence of any unusual element of danger. The natural and ordinary perils thereof are usually deemed to be obvious to children of the tenderest years, and as a

general proposition no liability attaches to the proprietor by reason of injury or death resulting therefrom to children who have come upon the land to bathe, skate, or play." An annotation on the subject is contained in 8 A. L. R. 2d page 1254 to page 1392. And see also annotations in 36 A. L. R. 224, 45 A. L. R. 990, 53 A. L. R. 1355, and 60 A. L. R. 1453.

Leave was given to plaintiffs to amend. Thereupon they filed the second amended petitions which contain no allegations concerning the attraction which the water hazard had for the children involved herein. And counsel for plaintiffs, evidently thinking or hoping that he could escape the effect of the above mentioned prevailing rule states in his brief as follows: "We have tried to make it clear that we do not plead and we do not intend to try our case on the principle of the turntable or attractive nuisance cases. We hold that our children were invitees * * * and that we need to prove only a lack of ordinary care."

It is accordingly to be determined as to whether or not the children in question here were in fact actual invitees as claimed. We must first consider the allegations of the second amended petitions herein. While the pleadings should be construed liberally, it must be done reasonably, and we should further bear in mind the rule stated in J. M. Carey & Bro. vs. City of Casper, (Wyo.), 213 P. 2d 263, 268, to the effect that:

" 'Omitted facts are to be considered as adverse to the pleader under the general presumption that a party will set forth all the facts favorable to his case.' " Examining the second amended petitions, it is somewhat difficult to determine what precisely the actual facts herein are. The area of the land in question is, if we understand it correctly, of the extent of approximately 90 acres, a large body of land outside of the city limits (1/4 of a mile away as stated in the brief of counsel for

the defendants). It does not appear where the water hazard was located upon the premises, or that it was near any street or highway or any houses or buildings, or how far the children traveled to reach the pool of water in the gravel pit in question, or whether the land in question was fenced or uninclosed. In Paragraph 6 of the second amended petitions it is alleged that the city devoted the land to uses described in the petitions. The term "devoted" evidently is a conclusion and must be based upon the remaining allegations. It is not alleged that the land was dedicated as a park, or as a place for amusement and that it was accepted by the city as such, or that the land was ever formally, by due act of the city authorities, set aside as a park or a place of amusement, so that the contrary may be inferred. See White vs. Kanawha City Co., 127 W. Va. 566, 34 S. E. 2d 17, 20. The petitions fail to show that the land was in anywise improved or that amusements or attractions of any sort were provided or maintained, or that any provision whatever was made for using the pit where the water was contained as a swimming pool, or that the city in any way regulated the use of the land or exercised any supervision over it. In fact the contrary may be inferred from the allegations of Paragraph 4 of the petitions which allege that the land had been used during part of the time as a pasture for livestock and that building materials for private building construction had been permitted to be hauled away from the premises in question. In view of the foregoing, it is clear that the facts in Ramirez vs. City of Cheyenne, 34 Wyo. 67, 241 P. 710, are quite different from the facts herein, and that case is not in point herein.

Furthermore it is difficult to see under the foregoing facts that any officer or employee of the city would have had authority to extend an invitation to the children to enter the premises, and if such invitation was given, that must arise by reason of other facts alleged in the

pleading. In Paragraph 6 of the second amended peti-
tions, plaintiffs allege that the city "kept and main-
tained the property as a playground and recreation
ground, inviting and permitting its use as such during.
all the time it has been publicly owned." We do not
understand the term "inviting" as here used to imply
an express or actual invitation to the children, but only
such as might be implied, if at all, by reason of the
knowledge, tolerance and acquiescence of the city. That
must be clear when we consider the foregoing allega-
tion in connection with other allegations in the second
amended petitions. For instance, in Paragraph 5, it is
stated: "Such uses were constant and continual and
with the full knowledge and acquiescence of the City."
Paragraphs 9 allege that: "The defendant has, during
all that time, had full knowledge of the fact that said
pit was being so used, and it has continually acquiesced
in such use." In the case of Paolino vs. McKendall, 24
R. I. 432, 53 Atl. 268, 60 L. R. A. 133, the court gave to
the term "invitation" contained in the pleading of the
plaintiff the same construction as we are giving to the
term "inviting" in this case, when the term "invita-
tion" was used in connection with "knowledge and con-
sent."

The question then arises whether mere tolerance and
passive permission of, and acquiescence in, the use of
premises as a playground by children makes these chil-
dren, invitees, so as to compel a land owner to have and
keep the property in a safe condition and free from any
danger to them. We think that the great weight of
authority is to the contrary and that in such case the
children, if not trespassers, are at most, bare licensees.
38 Am. Juris. 758-759, 45 C. J. 740, Prosser on Torts,
p. 628, Pastorello vs. Stone, 89 Conn. 286, 93 Atl. 529,
Cox vs. Alabama Water Co., 216 Ala. 35, 112 So. 352,
355, Polk vs. Laurel Hill Cemetery Ass'n., 37 Cal. App.
624, 174 P. 414, McCall vs. McCallie, 48 Ga. App. 99,

171 S. E. 843, Paolino vs. McKendall, 24 R. I. 432, 53 Atl. 268, Midland Valley R. Co. vs. Littlejohn, 44 Okl. 8, 143 P. 1, Kelly vs. Benas, 217 Mo. 1, 116 S. W. 557, 20 L. R. A. N.S. 903, State vs. Baltimore Fidelity Warehouse Co., 176 Md. 341, 4 Atl. 2d 739, 743, Galligan vs. Metacomet Mfg. Co., 143 Mass. 527, 10 N. E. 171, Sweeny vs. R. R. Co., 10 Allen (Mass.) 368, 373, Gallagher vs. Fordham & Loring Corp., 13 N. Y. S. 2d 322, Patton vs. Oil Co., (Ohio App.) 67 N. E. 2d 71. Numerous other cases might be cited. And as to the duty of a municipality toward trespassers or licensees, see 63 C. J. S. 303, where it is stated: "A municipal corporation is not liable for resulting injuries to trespassers on its premises, unless its negligence is of so gross a character as to amount to wanton infliction of injury." Again, "A municipal corporation as the owner of premises owes to a mere licensee no duty as to the condition of the premises, except that it must not wantonly injure him." In Pastorello vs. Stone, supra, involving a case where a child was drowned in a pool, a demurrer was sustained to the petition which alleged the existence of a pool on the premises of the defendant; that the grounds around the pool were used by the children as a playground to the knowledge of the defendants and was a dangerous place; that children had, to the knowledge of the defendants, fallen into the water previously, and that the child in question in that case, while playing with others around the pool, fell into it and was drowned. The court said in part: "So far as appears from the complaint the plaintiff's intestate was a mere trespasser or licensee upon the defendants' premises. * * * That the defendants knew that children were accustomed to play there and had not forbidden or prevented them did not constitute an invitation. Mere acquiescence in the presence of trespassers on one's premises, or neglect to drive them off, may be evidence of a license, but does not constitute an invitation to

them to enter. * * * The owner of land owes no duty to a trespasser or licensee to keep the premises in safe condition for their use. When they enter upon another's land they take it as they find it, and cannot assume that the owner has made it safe for persons so entering. Danger arising from the condition of the premises is assumed by them. * * * This is true of infant as well as of adult trespassers and licensees." In Cox vs. Alabama Water Co., supra, also involving the drowning of a child eight years of age, plaintiff alleged that the children in question in great numbers and with great frequency and for a long period of time, had been resorting to the pool in question, picnicking and playing there, and using the grounds immediately around the pool in question; that all of these facts were known to the agents and servants of the defendant and had been known to them for a long period of time. The court stated in part: "it is hard to infer an invitation from trespasses which have only the merit of repetition, and this court has said on good authority that neither sufferance, nor permission, nor passive acquiescence is equivalent to an invitation." Plaintiff was nonsuited. In Polk vs. Laurel Hill Cemetery Ass'n., a corporation, supra, also involving the drowning of a child eight years of age, and in which a demurrer to the petition was sustained, the court said in part: "It is true that the complaint discloses that the defendant by its agents and officers had knowledge of the fact that children were accumstomed to playing in the cemetery, and that they were permitted by the defendant, its agents, etc., to go in and upon the paths and byways of the cemetery to play therein and thereon. But mere knowledge by the defendant that children habitually went into the cemetery and therein indulged in their childish sports would make them, at the most, mere licensees to whom the defendant owed no duty or obligation." In the case of McCall vs. McCallie, supra, also involving the drown-

ing of a child nine years of age, and in which a demurrer to the petition was sustained, the court said in part:

"The fact that children and others had been bathing in this lake for a long time, and that the defendant knew this and did not forbid them to do so, but permitted free swimming, bathing, and fishing in the lake, would not render those of the public, including plaintiff's infant son, who so used the lake, invitees of the defendants, expressly or impliedly from known customary permissive use. While an invitation may be implied by a dedication, or may arise from known customary use in some instances, and may be inferred from conduct, if notorious or actually known to the owner or his authorized representative, or from any state of facts upon which it naturally and necessarily arises * * * still, to come under an implied invitation as distinguished from a mere license, the visitor must come upon the premises for the benefit, real or supposed, of the owner or occupant, or in a matter of mutual interest, or in the usual course of business, or for the performance of some duty." Without going into further details, similar facts appeared in the following drowning cases in which a demurrer was sustained or the plaintiff was non-suited or in which recovery was denied on the principle enunciated in the foregoing cases. Ellison vs. Alabama Marble Co., 223 Ala. 371, 136 So. 787, Clark vs. Manchester, 62 N. H. 577, 580, Bottum's Adm'r. vs. Hawks, 84 Vt. 370, 79 Atl. 858, Lewko vs. Chas. Krause Milling Co., 179 Wis. 83, 190 N. W. 924, Richards vs. Connell, 45 Neb. 467, 63 N. W. 915, Demmer vs. City of Eureka, 78 Cal. App. 2d 708, 178 P. 2d 472, Avery vs. Morse, 149 Misc. Rep. 318, 267 N. Y. S. 210, Luallen vs. Iron & Steel Corp., 236 Ala. 621, 184 So. 182, Dennis vs. Spillers, 199 Okl. 311, 185 P. 2d 465. See also Kemp vs. Doe Run Lead Co., (Mo. App.) 34 S. W. 2d 1002, Peters vs. Bowman, 115 Cal. 345, 47 P. 113, 598, City of Memphis vs. Trice, 13 Tenn. App. Rep. 607, Williams vs.

Kansas City et al., 222 Mo. App. 865, 6 S. W. 2d 48, Eades vs. Cast Iron Pipe Co., 208 Ala. 556, 94 So. 593, Sullivan vs. Huidekoper, 27 App. Cas. (D. C.) 154, Stendall vs. Boyd, 73 Minn. 53, 75 N. W. 735, 42 L. R. A. 288, 20 R. C. L. 97; 56 Am. Juris. 850-851. It seems that in order to constitute a playground in Pennsylvania so as to make it the duty of a land owner to see that water hazards are safe, it must appear that the playground immediately borders "both the homes of children using the playgrounds and the industrial and other establishments of the land owner." Murdock vs. R .Co., 150 Penn. Superior 156, 27 Atl. 2d 405. That is not the situation in this case.

Most of the cases relied upon by counsel are distinguishable. We shall mention only some of them. In Bicandi vs. Boise Payette Lumber Co., 55 Ida. 543, 44 P. 2d 1103, the children in question had been expressly invited on the premises. In Capp vs. St. Louis, 251 Mo. 345, 158 S. W. 616, 46 L. R. A. N. S. 731, a child was drowned in a pond, which contained what the court called an inexcusable nuisance. The pit in the case at bar, located as it was outside of the city was neither an actual nuisance, (Peters vs. Bowman, 115 Cal. 345, 47 P. 113, 598), nor was it located in a park. It is true that the city might have filled the hole in the pit, but it was not bound to do so. Peters vs. Bowman, supra, at 47 P. 599. Nation vs. City of St. Joseph, (Mo. App.), 5 S. W. 2d 1106, is similar to the Capp case. Doyle vs. Chattanooga, 128 Tenn. 433, 161 S. W. 997, and Davoren vs. Kansas City, 308 Mo. 513, 273 S. W. 401, 40 A. L. R. 473, are distinguished in City of Memphis vs. Trice, 13 Tenn. App. Rep. 607, where it is said of these cases: "These cases are based upon the reason as stated in the Doyle case that there is an invitation given by the city to all persons to go upon the street. In view of this invitation the city is bound to keep its streets safe for adults as well as children." Kemp vs. Doe Run Lead

Company, (Mo. App.), 57 S. W. 2d 758, involved an express invitation. Opitz vs. Town of Newcastle, 35 Wyo. 358, 249 P. 799, involved the question of repair of streets and has no bearing herein. In Wheeler vs. City of St. Helens, 153 Ore. 610, 58 P. 2d 501, cited by counsel for the appellants, it appears that a boy was drowned in a quarry filled with water. The property had been acquired by the city for the purpose of constructing a street, but at the time of the accident involved in the case, that part which contained the quarry in which the boy was drowned had not been opened as such. The court held that that portion of the property was held in its private capacity and that it was liable for the maintenance of that property in the same manner as that of a private person owning a similar tract. At the same time it also held that the child in question had a right to be where he was. We are unable to follow all of the reasoning of the court in that case. Conceding for the purposes of this case that when a city owns and holds property in its private capacity as counsel for the plaintiffs contends is true in this case, it ought not to be held liable for negligence to a greater extent than a private individual or corporation. If a city owns a water works plant or an electric light plant in its private capacity, children have no right to trespass on the property without an authorized invitation. Ritz vs. City of Wheeling, 45 W. Va. 262, 31 S. E. 993, City of Grandfield vs. Hammonds, 100 Okl. 75, 227 P. 140. And that should be true in connection with the land in question here.

Counsel for plaintiffs insist that when children are known to use premises as a playground, the duty of the owner or possessor is greater than that heretofore mentioned. It is true that the rule above enunciated seems inconsistent with, or is modified by, what is said to be the rule in other cases. Thus it is stated in Wolfe vs. Rehbein, 123 Conn. 110, 193 Atl. 608, speaking of an

owner or possessor of premises: "He is not ordinarily bound to anticipate and provide for the presence of trespassers since he may properly assume that they will not ordinarily be there. When, however, the owner knows or should know that children are likely to trespass upon a part of his land upon which he maintains a condition which is likely to be dangerous to them, he may be held liable for harm resulting to them therefrom." See to the same effect Indiana Harbor Belt R. Co. vs. Jones, 220 Ind. 139, 41 N. E. 2d 358, Wellman vs. Fordson Coal Co., 105 W. Va. 463, 143 S. E. 160, Gray vs. Golden, 301 Ky, 477, 192 S. W. 2d 371, Williams vs. Town of Morristown, (Tenn.), 222 S. W. 2d 607, 612, Garis vs. Eberling, 18 Tenn. App. 1, 71 S. W. 2d 215, Wolczek vs. Public Service Co., 342 Ill. 482, 174 N. E. 577, 580, Clifton vs. Operating Corp., 271 App. Div. 122, 63 N. Y. S. 2d 597, Clinton vs. Lumber Co., 77 Ga. App. 643, 49 S. E. 2d 143. See also 1 Thompson on Negligence (2d Ed.), Sec. 1030, 45 C. J. 748, Sec. 140 and page 750, Sec. 147, 3 Cooley on Torts, (4th Ed.) 204-205. It is not necessary herein to determine precisely in what cases or class of cases this rule is to be applied. It seems that according to some of the cases it is applicable principally in cases of an attractive nuisance or cases presenting a situation similar to that appearing in attractive nuisance cases. Polk vs. Laurel Hill Cemetery Ass'n., 37 Cal. App. 624, 174 P. 414, Bottum's Adm'r. vs. Hawks, 84 Vt. 370, 79 Atl. 858, 35 L. R. A. N.S. 440, Johnson vs. Wood, 155 Fla. 753, 21 So. 2d 353, Lyttle vs. Harlan Town Coal Co., 167 Ky. 345, 180 S. W. 519, Meredith vs. Fehr, 262 Ky. 648, 90 S. W. 2d 1021, Gray vs. Golden, 301 Ky. 477, 192 S. W. 2d 371, Ramsay vs. Tuthill Bldg. Material Co., 295 Ill. 395, 129 N. E. 127, 36 A. L. R. 23. In any event the applicability of this rule would seem to depend on the nature of the danger confronting the children. And it seems that it is at least less readily applied in connection with

water hazards than in other cases. Compare, for instance, the West Virginia case, last above cited, with the opposite holding in White vs. Kanawha City Co., 127 W. Va. 566, 34 S. E. 2d 17. We have already cited numerous drowning cases in which the ordinary rule relating to trespassers and licensees and not the foregoing rule was applied and other cases will be cited hereafter.

The reasons are stated in Morris vs. City of Britton, 66 S. D. 121, 279 N. W. 531 as follows: "From our study of the cases, it appears that this inclination to deny liability for injury to trespassing children occasioned by pools or ponds is based upon two considerations: First, because of practical considerations. Once a court decrees liability for injury occasioned to a child in an unguarded pool or pond, it would be difficult to place any practical limitation upon such liability. * * * Second, liability is denied for the reason that the danger inherent in water when contained in a pond or pool is or should be obvious to a child, and such pond or pool does not, therefore, constitute 'an unreasonable risk of death or serious bodily harm' to trespassing children." In 20 Ruling Case Law 96, it is stated: "Ponds, pools, lakes, streams, and other waters embody perils that are deemed to be obvious to children of the tenderest years; and as a general proposition no liability attaches to the proprietor by rea- of death resulting therefrom to children who have come upon the land to bathe, skate, or play. * * * Accordingly, a right of recovery has been denied in the case of children eleven, ten, nine, eight, seven, six, and even five years of age." In Peters vs. Bowman, 115 Cal. 345, 47 P. 113, on rehearing, 47 P. at page 599, the court stated: "A pond, although artificially created, is in no wise different from those natural ponds and streams, which exist everywhere, and which involve the same dangers and present the same appearance and the same attractions to children. * * * A pond cannot be rendered inaccessible to boys by any ordinary means. Certainly

no ordinary fence around the lot upon which a pond is situated would answer the purpose; and therefore, to make it safe, it must either be filled or drained, or, in other words, destroyed. But ponds are always useful, and often necessary, and where they do not exist naturally must be created, in order to store water for stock and domestic purposes, irrigation, etc. Are we to hold that every owner of a pond or reservoir is liable in damages for any child that comes uninvited upon his premises and happens to fall in the water and drown? If so, then upon the same principle must the owner of a fruit tree be held liable for the death or injury of a child who, attracted by the fruit, climbs into the branches, and falls out. But this, we imagine, is an absurdity, for which no one would contend." In Barnhart vs. Chicago, M. & St. P. Ry Co., 89 Wash. 304, 154 P. 441, L. R. A. 1916D, 443, the court said in part:

"That a pond of water is attractive to boys for the purposes of play, swimming, and fishing no one will deny. But its being an attractive agency is not sufficient to subject the owner to liability. It must be an agency such as is likely, or will probably, result in injury to those attracted to it. That many boys every year lose their lives by drowning is a matter of common knowledge. But the number of deaths in comparison to the total number of boys that visit ponds, lakes, or streams for purposes of play, swimming, and fishing is comparatively small. It would be extending the doctrine too far to hold that a pond of water is an attractive nuisance." In the case of Polk vs. Laurel Hill Cemetery Ass'n., 37 Cal. App. 624, 174 P. 414, 418, the court said in part: "A pond of water, it may be conceded, is always attractive to youngsters; but the dangers connected with and inherent in a lake or pond of water, natural or artificial, are obvious to everybody—even to a child old enough to be permitted by its parents to go about and play unattended upon the streets or in the

public parks. It would not conform to the dictates of common reason to say that a child of the age of eight years, or even much younger, does not know and fully realize that a fall into a pond of water or a deep reservoir would result in injury to him, if not in his death." See also McCleod vs. Milling Co., 71 S. D. 362, 24 N. W. 2d 485. In other words, as some of the authorities would express it, courts are not justified, as they would be in many other cases (see 38 Am. Juris. 806) to give children who are trespassers or mere licensees the status and protection of invitees in case of an ordinary water hazard, for the reason among others that to do so would be an undue invasion of the rights of privacy on the part of owners and possessors of land. That has been held not only in states which recognize the doctrine of attractive nuisance but also in other states. Many courts add that the duty to protect children from harm is primarily upon the parents and not upon third parties. 38 Am. Juris. 780.

Counsel for plaintiffs, however, insist that the pool of water in question here was not an ordinary water hazard by reason of the perpendicular drop from shallow into deep water. That is perhaps a debatable question. But in many cases—ten in number so far as we have found—in which a similar situation has been considered, it was held, or the result has been, that such fact did not take the case out of the general rule, and that no recovery for damages could be had for the drowning of a child. In the case of Washabaugh vs. Northern Virginia Const. Co., 187 Va. 767, 48 S. E. 276, the boy in question in that case, nine years old, with his playmates, was playing, as other children of the neighborhood with knowledge of defendant had done before, in the water in a gravel pit in question, and while so playing, and walking or paddling to a raft which had been left in the pit, he fell into the deep water and drowned. It was alleged in the petition that after the defendant

ascertained that children were using the water in the pit as a wading or swimming pool, it became a duty imposed upon it by law to erect a fence or other barricade around the pit. A demurrer to the petition was sustained by the trial court which action was upheld by the higher court. The facts as stated by the court were as follows: "the defendant is engaged in quarrying rock and gravel on its land in Fairfax county. In the conduct of this enterprise defendant has opened and continues to keep open a large pit from which rock and gravel have been removed. Around the pit the land gradually slopes toward the outer rim from which shelves project inward. From the inner edges of these shelves the walls of the pit drop perpendicularly to a depth of 25 feet. Water rising from the bottom and seeping in from the sides has filled the deep holes and has covered the bottom of the shelves so that the general appearance of the pit is that of a large pond of water which, at times, is so muddied from the surface water that it is impossible to distinguish by sight the shallow from the deep water." The court said among other things: "Plaintiff concedes that a natural pond or lake as well as an artificial pond or lake built for a specific purpose is not regarded as a dangerous instrumentality and that the owners of the same are not required to take any precautions to prevent children from using them. He contends that the natural slope of the land around the pit, and the inability of one by sight to distinguish the shallow places from the deep holes created a hidden or latent danger that imposed upon the owner the duty to prevent children from using it. Similar conditions exist on the banks of streams and rivers, natural and artificial ponds and lakes, which are found in every section of Virginia. We know boys, younger and older than plaintiff's decedent, who fish, hunt, swim, and climb trees on lands other than the lands of their parents. All of these activities are attended with

some degree of peril or danger. Boys fall out of trees, and into streams and ponds. Fortunately, fatal accidents are rare. It is a boy's nature to see what is farther down or upstream, what is just over the hill, or on the other side of the pond. Most land owners know this, and, so long as no serious damage is done to property, little if any complaint is made about trespassing boys. It would take more than a mere warning sign, fence, or any ordinary barricade to prevent adventurous boys from fishing in a still pool, or taking a swim in a natural or artificial pond. * * * The large pond of water thus created exposed a child playing in or around it to no more peril or danger than if he had been playing in or around a natural body of water. The primary duty to inform, advise, and protect a child against such natural, open, and obvious dangers is upon the parents and not upon strangers. To require the proprietor of such a business enterprise to erect a fence or barricade around a pool and across a private road of such a character that it would prevent adventurous youth from entering, would impose such a burden that would unduly interfere with the lawful use of the property. While tragic accidents of the nature disclosed are always possible, they are not any more likely to happen in this artificial pond than in a natural stream of water. Such danger is natural, open, and obvious, and is ordinarily encountered in most places where children gather to wade or swim."

In the case of City of Toledo vs. Cummings, 121 Ohio St. 37, 166 N. E. 897, a case very closely in point herein, the following facts appear. A boy was drowned in a creek in what was called Ravine park. The petition charged that the city caused or permitted a dangerous hole, pond, or lake to be made by the depression between a roadway and the embankment of a railroad company, the water therein standing from two to four feet deep, and that a ditch had been constructed therein

about five feet wide and eight feet deep connected with a drain going under the railroad embankment; that the city permitted water to accumulate or remain so that it became a nuisance; and that the boy in question was attracted to this pond and while wading therein, and being unable to swim, fell into the deep ditch and was drowned. It was alleged that the city knew or by the exercise of reasonable care should have known that children who were unable to swim frequented this pond, and that the city was negligent in failing to enclose or guard it. It further appeared that while the tract in question was denominated a public park in that it was public ground belonging to the city, it was not in any wise improved, and no amusements or attractions of any sort were provided or maintained, and no provision whatever had been made for using this pond as a swimming pool. Here, accordingly, we find a drop from shallow into deep water. Judgment was in favor of the City of Toledo, and this judgment was upheld by the Supreme Court. The court said in part: "A very serious extension of liability on the part of the municipality would be involved if it were to be held that every pond or lake or stream must be abated, or that guards must be provided to patrol the vicinity of every such body of water, or fences or walls or barricades be erected to prevent persons from entering them."

In the case of Thompson vs. Illinois Cent. R. Co., 105 Miss. 636, 63 So. 185, it appears that a boy nine years of age was drowned. The lake outside of the limits of a city was quite large, covering some 100 acres of land, but contained some deep and dangerous holes and the boy in question, nine years of age, was drowned in one of these deep holes, thus presenting a question similar to that in the case at bar. It was charged that the boy was attracted to and was impliedly invited to the pond or lake; that it was the custom of children to wade in the lake and that this was permitted by the agents of

the railroad company. A demurrer was sustained to the petition and that action of the trial court was upheld by the Supreme Court. The court held that no trap was set for the child and stated among other things: "Here we have a generally shallow body of water covering a large area in the woods, a half mile from the inhabited parts of the town, wherein boys waded, and wherein appellant's boy was drowned. We think it must be conceded that this deplorable tragedy could not have been anticipated as probable by the exercise of reasonable forethought, nor could it have been prevented by any reasonable precautions. Of course, one could have anticipated the possibility of this sad event; but we think the danger was comparatively remote. Scattered over the length and breadth of the land are innumerable ponds ands lakes, artificial and natural; and occasionally a boy or man loses his life while wading, or bathing, in such body of water. If, as a matter of law, the owners of fish ponds, mill ponds, gin ponds, and other artificial bodies, wherein it is possible that boys may be drowned, can be held guilty of actionable negligence unless they inclose or guard same, few will be able to maintain these utilities, and to our minds an intolerable condition will be created."

In the case of Klix, Adm'r. vs. Nieman, 68 Wis. 271, 32 N. W. 223, the court sustained a demurrer to the petition. That holding was upheld by the Supreme Court. In that case, too, a boy was drowned apparently in going into deep water as in the case at bar. The facts are stated by the court as follows: "The complaint states that the defendant was the owner of and in the possession of a lot in the city of Milwaukee, * * *; that the lot was in a thickly settled and populous part of the city, and was not inclosed by fence, either in front thereof * * *, nor on the side * * *, but that the lot was vacant and open, so that the public had free and unobstructed access thereto * * *; that for a long time

prior to the fifth of September, 1885, there had been upon the lot a deep and dangerous hole or excavation, partially filled with water, making a pond which covered about the entire surface; that the water of the pond was roily, so that its depth could not be ascertained except by measurement, but that, in places, it was of the depth of nine feet, so that the pond was dangerous to the lives of children, who might be attracted thereto for amusement, or otherwise; that the defendant, well knowing that the pond was dangerous to the lives of children, residing in the vicinity of the same, wrongfully, negligently, and carelessly permitted it to remain unguarded by fence or barricade, and the plaintiff's son, a lad about 9 years of age, 'while playing upon and about said pond of water, being induced thereto by reason of the unguarded and unprotected condition of said hole as aforesaid, fell and was precipitated into the same, and was drowned.' " The court said among other things: "The rule that holds persons responsible for injuries caused by spring guns, man-traps, etc., is familiar and well settled; but it has no application here. Unless we hold that the defendant was under a legal obligation to fence this pond for the protection of children reaching and playing upon it, there can be no recovery. And it is obvious that a fence would have to be very high and very tight to afford any effectual guard against children having access to the pond. But upon the facts, we do not think the law imposed the duty upon the defendant of building a fence or guard to prevent children from reaching the pond; therefore he is not liable for the death of the child."

The case of Raeside vs. Sioux City, 209 Ia. 975, 229 N. W. 216, presents some facts very similar to the case at bar. The city constructed a storm sewer for the purpose of draining storm water from various streets to and upon a tract of land adjoining. "Said storm water was carried from its natural course, causing a small

lake or shallow pond of water to form upon said land, and in addition thereto, at the mouth of said storm sewer, the force of the water continuing therefrom caused a pit about ten feet deep and ten feet in diameter, which was filled with water to the same level as the water in the aforesaid shallow pond, and connected with the water in said pond by a channel about five feet in width. The depth of the water in the shallow pond was about two feet, until it reached a point about ten feet from the mouth of the storm sewer, at which point the bottom of said pond dropped abruptly and sharply downward for a distance of seven or eight feet." A boy, eight years of age, was with others playing in and about the storm sewer and pond without objection on the part of the defendant, and in the course of play, the boy dropped suddenly into the pit in front of the storm sewer, into ten feet of water, and was drowned. The court held that the demurrer to the petition should have been sustained. Quoting from an earlier Iowa case, the court said: "It may be conceded that the pond was attractive to children. So are all bodies of water. The trouble with the case is, that there was nothing about this pond to render it more attractive or to enhance the danger over the attractions or dangers of natural bodies or streams of water; such lakes, ponds and streams being scattered over the country nearly everywhere. '* * * In the absence of anything indicating something done by the landowner calculated to render the pond attractive to children, something more than of water in its natural state, or more alluring to danger than ordinarily attends playing in its vicinity, the doctrine of the turntable cases have never been and ought not to be applied. * * * As the pond was not other than a mere barrow pit, common wherever railroads have been constructed without characteristics different than natural collections of water in small ponds, and without additional attraction or enhance-

ment of danger, the court rightly denied recovery.' "
Numerous cases in support of the holding of the court
are cited.

In the case of Moran vs. Pullman Palace Car Co., 134
Mo. 641, 36 S. W. 659, 33 L. R. A. 755, it appears that
for a number of years boys in the vicinity and neigh-
borhood of a certain pond had been accustomed at all
hours during the day to bathe in it. Of evenings men
also would come to the pond for the purpose of bathing.
Plaintiffs alleged that the pond was attractive to chil-
dren who were accustomed to bathe therein; that it was
a dangerous place by reason of a deep hole therein; that
defendants knew or might have known of the danger of
the place to children, and that they were in the habit of
bathing in the pond; that defendants negligently per-
mitted the pond to be frequented by children and to re-
main unguarded, and neglected to fence the deep hole
in one end of the pond in which the boy in question,
nine years of age, was drowned, the boy passing from
the shallower water into this deep hole. Judgment for
the defendant was sustained.

In the case of Melandez vs. City of Los Angeles, 8
Cal. 2d 741, 68 P. 2d 971, it was alleged that children
regularly used the pool in question in that case; that
most of the water in the pool was between one and two
feet deep with the exception of a deep hole seven feet in
depth and with a diameter of approximately ten feet,
which it was alleged, was a trap to children who were
accustomed to play in the pool and of which deep hole or
trap, children playing thereon were not advised. The
child in question was eleven years of age and was
drowned in the deep hole in the pond. The court upheld
the trial court in sustaining a demurrer to the petition.
It refers to a previous case presenting similar features,
namely, to the case of Beeson vs. City of Los Angeles,
115 Cal. App. 122, 300 P. 993. The court stated: "There,

also, the pool of water was formed by a storm drain in which muddy water stood at an average depth of approximately one foot, except at one end where there was a pit or hole about seven or eight feet in depth concealed by the muddiness of the water and the debris, and caused by the emptying of the water into the open drainage ditch from a cement conduit with such force as to dig out the floor of the open drainage ditch. There also notice of the dangerous condition of the ditch and of the fact that children played there and failure to remedy the situation were alleged in the complaint. It was held that the doctrine of attractive nuisance did not apply. * * * The court took into consideration the common knowledge that the perils of water are instinctively known even by a boy of ten years of age and the further fact that water running over soil operates against the probability of a continuous even bed. As is said in Tavis vs. Kansas City, 89 Kan. 547, 132 P. 185, 187: 'All know that there are many pools in every running stream, and, when the bed of the stream is not rock, deep places are found below every bridge and culvert through which much water passes. It is not practicable to provide openings in bridges or culverts large enough to carry away the water as rapidly as it falls in times of freshets, and the force with which the dammed water goes through the openings under such circumstances is likely to erode the soil or bed of the stream below the bridge. The same effect is noticeable at every bend in the stream, and also wherever there is a tree or other obstruction along the stream which affects the flow of the water.' These matters of common knowledge should be applied in the instant case."

In the case of King vs. Simons Brick Co., 42 Cal. App. 2d 586, 126 P. 2d 627, the facts were very similar to the case at bar. It was alleged substantially as follows: The defendant caused the soil to be removed from a portion of its property, leaving a huge pit of about four acres in

area; that defendant deepened two acres of the pit to an average depth of 25 feet below the surface of the adjoining land and street levels; that defendant ceased its excavation on the property more than five years prior to the filing of the petition in this action; that thereafter defendant permitted water to accumulate in the pit to such an extent that it overflowed the higher acres of the pit and covered one-half acre of the upper bottom surface thereof from 2 to 18 inches in depth; that for several weeks prior to the time when the boy in question was drowned, the water was cloudy and opaque and wholly prevented visual determination of its depth; that the water served no useful purpose and could have been removed at a nominal expense without impairing the value of the property; that for many weeks prior to the date the boy was drowned the accumulated water constituted a lure and an attraction to the children of the neighborhood, who desired to wade and bathe therein; that by reason of the method of excavating the areas of the bottom of the pit the shallow areas of water descended precipitously to the lowest portions of the pit and constituted a deception and trap to the children playing in the shallow parts, who were unable to swim and who were unaware of the existence of the deep water; that the boy in question entered the pit for the purpose of bathing; that he had no knowledge of the deeper portions of the water; that after he had waded for awhile in the pit from an unsubmerged projection of the land, in water 18 inches deep, he plunged again into the waters at about the same point, only to reach instantly a depth of 18 feet, from which he was unable to swim, and was drowned. The court upheld the trial court in sustaining a demurrer to the petition. And it was said in part quoting from previous California cases: "The foregoing will serve to demonstrate that the doctrine of attractive nuisance has not been expanded by any decision in this state so as to

include an unguarded pool of water concerning which it is 'the duty of parents to guard and warn their children, and, failing to do so, they should not expect to hold others responsible for their own want of care.' Peters vs. Bowman, supra, 115 Cal. page 356, 47 P. page 599, 56 Am. St. Rep. 106. It is only in those cases where a dangerous trap on premises otherwise safe is concealed from view or when an artificial device, attractive to children, is left exposed and upon premises accessible, open and unguarded that the owner is liable for damages resulting by reason of injuries to children who are attracted to the premises by such contrivances."

In the case of Baker vs. Contracting Co., 271 Ill. App. 300, a boy ten years of age stepped from shallow water into a deep hole ten feet in depth and was drowned. A judgment in favor of the plaintiff in the lower court was reversed, the appellate court holding that the pond in question was not such an agency as would probably result in injury to those attracted to it. The court quoted from Mindeman vs. Sanitary District, 317 Ill. 529, 148 N. E. 304, as follows: " 'That a pond of water is attractive to boys for the purposes of play, swimming, and fishing no one will deny. But its being an attractive agency is not sufficient to subject the owner to liability. It must be an agency such as is likely, or will probably result in injury to those attracted to it. That many boys every year lose their lives by drowning is a matter of common knowledge. But the number of deaths in comparison to the total number of boys that visit ponds, lakes or streams for purposes of play, swimming, and fishing is comparatively small. It would be extending the doctrine too far to hold that a pond of water is an attractive nuisance.' " And finally it was said in McCall vs. McCallie, 48 Ga. App. 99, 171 S. E. 843, as follows: "By the great weight of authority, the attractive nuisance doctrine has been held not to apply

to ponds, where there is no unusual danger. The fact that the pond had a deep hole therein, which was known to the defendants and not known to plaintiff's son, would not operate to take the cause out of the above rule. Klix vs. Nieman, 68 Wis. 271, 32 N. W. 223, 60 Am. Rep. 854; Moran v. Pullman Palace Car Co., supra, (134 Mo. 641, 36 S. W. 659). The danger from fire or water is one that even young children may be said to apprehend. Although an owner of land may know of the habit of children to visit a pond on his premises and bathe, he is as a rule under no obligation to erect barriers or take other precautions to prevent them from being injured thereby."

We do not feel justified in holding the contrary of what was held in this great array of authorities, particularly when the unfortunate accidents in this case happened as they did on an outlying parcel of land which gave no indication to children or adults that it was intended to be used as a playground.

The judgments of the District Court are accordingly affirmed.

RINER, C. J., and KIMBALL, J. concur.